IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI

SARAH JANE BEAUGEZ                                                    PLAINTIFF

v.                                            Civil Action No.: 3:14-CV-00170-MPM-JMV

THERAPY MANAGEMENT CORPORATION, et al.            DEFENDANTS

**MEMORANDUM OPINION**

This matter comes before the Court for consideration on the *Defendants' Motion for Summary Judgment* and brief in support thereof (collectively, the "Motion")[60][61], filed on August 26, 2015, on behalf of defendants Therapy Management Corporation ("Therapy Management") and Tristar Rehab, Inc. ("Tristar," or, collectively, the "Defendants"). On September 21, 2015, plaintiff Sarah Jane Beaugez (the "Plaintiff") filed her *Plaintiff's Response to Defendants' Motion for Summary Judgment* and accompanying memorandum in support thereof (collectively, the "Response")[77][78]. Finally, on October 6, 2015, Defendants filed their *Rebuttal Memorandum Brief in Support of their Motion for Summary Judgment* (the "Reply")[85]. The Court has considered the pleadings, evidence, and relevant case law and concludes that there does not exist a genuine issue of material fact. Accordingly, the Motion is due to be granted and the case dismissed.

**I.     JURISDICTION**

Plaintiff is a resident of Ocean Springs, Mississippi. Defendant Therapy Management is a Florida Corporation doing business in the State of Mississippi. Defendant Tristar is also a Florida corporation doing business in Mississippi. This Court has jurisdiction pursuant to 28 U.S.C. § 1332. This case also concerns interpretation of federal laws,[1] thereby necessarily

---

[1] Middle Class Tax Relief and Job Creation Act of 2012, 47 U.S.C. 1401, *et seq.*

1

raising a federal issue. Accordingly, this Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

## II. FINDINGS OF FACT

The following facts and history of the case are not in dispute. Plaintiff had two stints of employment with the defendant, Therapy Management – one in Texas and the other in Mississippi. Her employment in Mississippi is at the center of this litigation.

Defendants are in the business of providing rehabilitation services for people with physical disabilities. On April 14, 2014, plaintiff applied to work for Therapy Management as a physical therapist. In her employment application, signed March 14, 2014, Plaintiff acknowledged that her employment was "at will, for no specified time" and that it could be terminated "by either Therapy Management Corporation or myself or any time, with or without notice." [60, Ex. D, Pg. 4]. On April 7, 2014, a letter was sent to Plaintiff, offering Plaintiff employment as a physical therapist, which specified that "[i]n accepting our offer of employment, you certify your understanding that your employment will be on an at-will basis." [60, Ex. E, Pg. 2].

During her employment, Plaintiff was assigned to provide physical therapy services at the New Albany Health and Rehab in New Albany, Mississippi ("New Albany Rehab"). At that location, Ms. Lisa Andrews was Plaintiff's direct supervisor. As part of her job responsibilities, Plaintiff was responsible for entering raw data into Defendants' computer system regarding physical therapy treatment being provided to the residents at New Albany Health and Rehab. This raw data was used to compute reports regarding a patient's physical condition and projected therapy and treatment. The reports are provided to Medicare, so that they may be used to

determine payments to be made by Medicare and the United States Government to rehab centers for services provided.

Beginning with the Middle Class Tax Relief Act of 2012, Centers for Medicare & Medicaid Services ("CMS") requires healthcare providers, including, but not limited to, physical therapists (PT) (such as the Plaintiff), occupational therapists (OT), and speech therapists (ST) working for agencies contracted to skilled nursing facilities, to collect information that generates billing for Medicare Part B services. Effective July 1, 2013, all healthcare providers were mandated to report to CMS, using G-Codes and severity modifiers. G-Codes and severity modifiers define functional limitations of patients to receive services. G-Codes and severity modifiers must be included with billing in order for Medicare to pay claims submitted by providers. CMS mandates G-Codes and severity modifiers are to be accurately reported at the time of the initial evaluation, every tenth visit and upon discharge. Federal regulations require that accurate G-Codes and severity modifiers be determined and reported by therapists who evaluate the patient.

Plaintiff contends that in May of 2014, while employed as a physical therapist for Defendants in Union County, Mississippi, she became concerned with the data entry system used to generate G-Codes. Around this time, Plaintiff reportedly called someone in the information technology ("IT") department to ask about the data entry system. Plaintiff admitted in her deposition testimony that she did not know the name of the person to whom she spoke, though she recounted the exchange as such:

> [W]hen I started pulling my documentation, I realized that the G codes and the modifiers are on this page, and they were not – well, I'm not even going to say that right now. I'm going to say that I didn't think – I mean, it wasn't even that much of a thought. It was where did those percentages come from? So when I called, and I said, "Y'all, I – I really can't figure out." I said, "I would not have given this patient this – this percentage of limitation. Where did it come from," to

which they replied very immediately, "It is not your right or any other right of the therapist to know. It is an internal generated statistic percentage," and, basically, "don't ask again."

[60, Ex. C, Pg. 73].

Plaintiff also contends that she called Leslie Mills, a regional manager located in Texas, to discuss the reporting system. [60, Ex. L]. In her deposition testimony, Plaintiff admits that she did not claim or suggest to Ms. Mills that Defendants were engaged in Medicare fraud, but instead contends that such accusations or suspicions would be implied. [60, Ex. C, Pg. 75-76].

On June 2, 2014, Ms. Andrews – Plaintiff's direct supervisor at the New Albany location – sent an email to regional manager, Lydia Lambert, opining that Plaintiff was not a good fit for the organization and seeking permission to terminate Plaintiff's employment. [60, Ex. 10, Pg. 4-5]. The email was then forwarded on to Monica Gagnon, human resources manager, who, on June 3, 2014, approved the decision to terminate Plaintiff's employment. [60, Ex. K]. Plaintiff's employment was, accordingly, terminated sometime thereafter.

What remains in dispute – and the issue at the center of this litigation – is whether the decision to terminate Plaintiff's employment was caused by the Plaintiff's attempts to report and/or investigate what she considered to be Medicare fraud. On June 29, 2014, Plaintiff filed her Complaint in this Court,[2] seeking to recover actual and punitive damages for what she asserts was a discharge in violation of public policy. As alleged by the Plaintiff, it was only after she complained to senior management about the G-Code reporting procedures that she was fired, and that "[t]here was no record of any problems with Plaintiff's work performance…" and that "Plaintiff was terminated because she had reported illegal activity of Defendants." [3].

Defendants, of course, advance a different recitation of events, claiming that the decision to terminate employment was in no way based on any alleged reporting of Medicare fraud.

---

[2] A *First Amended Complaint* [3] was filed on August 12, 2014.

Such a conclusion is supported, they claim, by the fact that no fraud was taking place, nor did anyone making termination decisions know of Plaintiff's supposed complaints. Defendants instead argue that the decision to terminate Plaintiff's employment was based on complaints Therapy Management had received regarding work performance and behavior. According to the Defendants, soon after Plaintiff began employment, Ms. Answers began receiving complaints from New Albany Rehab, stating that the Plaintiff was "rude and unprofessional and was generally belittling to the staff…" [61]. Further, on June 2, 2014, Ms. Andrews received a report of Beaugez being rude to a family member of a patient. As alleged by the Defendants, Plaintiff's behavior was such that it endangered the relationships Defendants had worked to cultivate with various rehabilitation centers.

### III. CONCLUSIONS OF LAW

Pursuant to the Federal Rules of Civil Procedure, summary judgment is appropriately granted when the evidence shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine issue of material fact exists where a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). When evaluating a motion for summary judgment, the court must construe the facts and evidence in the light most favorable to the nonmoving party. *Ford, Bacon & Davis, LLC v. Travelers Ins. Co.,* 635 F.3d 734, 736 (5th Cir. 2011). If the party seeking summary judgment meets its initial burden, the nonmoving party must then "come forward with specific facts showing a genuine factual issue for trial." *Harris ex rel. Harris v. Pontotoc Cnty. Sch. Dist.*, 635 F.3d 685, 690 (5th Cir. 2011). The nonmoving party cannot rely on metaphysical doubt, conclusive allegations, or unsubstantiated assertions but instead must show that there is an actual controversy warranting trial. *Little v. Liquid Air Corp.*,

37 F.3d 1069, 1075 (5th Cir. 1994). "[A] a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 317, 106 S. Ct. 2548, 2550, 91 L. Ed. 2d 265 (1986).

Mississippi is an employment at will state, the general rule for which is that "a contract for employment for an indefinite period may be terminated at the will of either party, whether the termination is for any reason or no reason at all."[3] *Buchanan v. Ameristar Casino Vicksburg, Inc.*, 852 So. 2d 25, 26 (Miss. 2003). Mississippi has recognized only two exceptions to the employment at will doctrine, and both are narrowly construed:

> (1) An employee who refuses to participate in an illegal act . . . shall not be barred by the common law rule of employment at will from bringing an action in tort for damages against [her] employer; and
> (2) An employee who is discharged for reporting illegal acts of [her] employer to the employer or anyone else is not barred by the employment at will doctrine from bringing action in tort for damages against [her] employer.

*McArn v. Allied Bruce-Terminix Co., Inc.*, 626 So.2d 603, 607 (Miss. 1993). Accordingly, in order to sustain a claim for wrongful termination under Mississippi law, Plaintiff must establish that she falls within one of these exceptions.

The term "illegal act" within the meaning of *McArn* means that "the acts complained of warrant the imposition of criminal penalties, as opposed to mere civil penalties." *Hammons v. Fleetwood Homes of Mississippi, Inc.*, 907 So.2d 357, 360 (Miss. Ct. App. 2004). On this point, it is insufficient for an employee to merely believe the employer's actions are illegal. *See Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 403 (5th Cir. 2005) (rejecting argument that the

---

[3] Mississippi state law is applied in an employment suit based on federal diversity jurisdiction. *Krieser v. Hobbs*, 166 F.3d 736, 739 (5th Cir. 1999).

exception does not require a plaintiff to prove that the alleged illegal act reported is actually illegal, only that plaintiff had a good faith belief of the same; stating that "Appellants' attempt to equate an employee's 'good faith *effort*' in reporting illegal activity, which is protected under the common law exception, with a good faith *belief* that illegal activity is taking place is misplaced."). Instead, "the criminality of the conduct must be demonstrated via 'substantial evidence or citation to binding statutory and/or case law.'" *Cleland v. Acad. Sports & Outdoors*, 2013 WL 5771256, at *4 (S.D. Miss. Oct. 24, 2013).

### A. Defendants' Actions Not Demonstrated to be Illegal

Plaintiff's largest – and, as evidence shows, insurmountable – hurdle in this case, is that she is unable to demonstrate by substantial evidence that the Defendants' conduct was criminal. As discussed above, the CMS requires that certain patients requiring therapy services have standardized outcome measures, and that these measures be reported to CMS on a dysfunctional scale. [60, Ex. G, MLN Matters Number MM8005]. This mandate was a result of the Middle Class Tax Relief Act of 2012's, 24 U.S.C. §3005(g) requirement to begin collecting data on patient functions during the course of therapy services so that CMS could better understand patient condition and outcomes. Id. The mandatory functional outcome reporting is more colloquially known as "G-Codes," and is at the center of this litigation.

Physical therapists such as the Plaintiff are charged with selecting the focus of therapy for a given patient, and report outcome measures at the time of evaluation, at each interval, and at discharge. When claims are submitted for payment, they must also include an anticipated goal status, as well as current status or discharge status. G-Codes are required on claims to be submitted for payment, though as evidence presented shows, G-Codes are non-payable. *Id*. In addition to G-Codes, there are certain "modifiers" which must be included in any claim, meant to

7

report on the severity or complexity of the functional measure assigned. It is the Defendants' policy to have PT's such as the Plaintiff, enter the raw data regarding a patient's functionality and also indicate the severity of their symptoms. Raw data is then processed through a statistical formula, ostensibly ensuring a correct G-Code is identified with the corresponding data.

The crux of the Plaintiff's claim rests on the idea that Defendants are improperly assigning G-Codes and modifiers – "instead of utilizing the data gathered by the examining licensed therapist" – which allegedly represents Medicare fraud. However, in her deposition, when presented with information regarding a patient's plan of treatment, Plaintiff admitted that the G-Codes were accurate, but that the modifier was not one which she would have selected. [60, Ex. C]. Plaintiff appears to take issue with the computer-generated percentage as to what the patient's outcome would be in the future. However, Plaintiff is unable to point to any actual instance where the computer-generated outcome differed from the actual outcome.

Plaintiff's differing opinion on what a patient's predicted outcome might be does not indicate criminal behavior on the part of the Defendants. "Claims are not 'false' when reasonable persons can disagree regarding whether the service was properly billed to the Government." *United States of America v. Prabhu,* 442 F. Supp. 2d 1008, 1026 (D. Nev. 2006). *See also United States ex rel. Lamers v. City of Green Bay,* 168 F.3d 1013, 1018 (7th Cir. 1999) (holding that "errors based simply on faulty calculations or flawed reasoning are not false" under the False Claims Act and "imprecise statements or differences in interpretation growing out of a disputed legal question are similarly not false" under the FCA).

Plaintiff is similarly unable to show that inaccurate information and/or reports were presented to Medicare for impermissible payment. Without actual knowledge of fraudulent or inaccurate reports being made, the Plaintiff's claim fails. *See U.S. ex rel. Hendren v. Mayo*, No.,

2012 WL 405665, at *3 (N.D. Miss. Feb. 8, 2012) (holding that where "there is no allegation that the defendants submitted bills for unperformed services or acted with the intent of getting a false claim paid by the Government," the plaintiffs' suspicion alone was not enough to establish a valid FCA claim. The complaint did not contain the "who, what, when, where, and how" of the alleged fraud occured.). Given that the Plaintiff has failed to come forward with any actual Medicare claim for payment containing an inaccurate G-Code, she cannot show that inaccurate or false information was fraudulently presented for payment. Similar to the situation in *Mayo*, this Court finds that Plaintiff fails to establish the "who, what, when, where and how" of any illegal activity.

Without being able to show an underlying illegal action, Plaintiff is unable to sustain a claim based on the *McArn* exceptions. On this point, the Court finds that the movants have carried their burdens to show that no genuine issue of material fact exists. Although this Court is charged with viewing the evidence in the light most favorable to the Plaintiff as the non-moving party, it cannot overlook the fact that Plaintiff has failed to come forward with any competing evidence, regarding these issues on which she bears the burden of proof at trial. The Plaintiff relies almost entirely on blanket assertions regarding the alleged criminality of the Defendants' actions.[4] However, outside of her own beliefs and interpretations of the Defendants' actions, Plaintiff is left, metaphorically speaking, empty-handed. As stated above, a reading of her deposition testimony shows that, at best, she is able to demonstrate differing opinions.

---

[4] The Court notes that certain statements and assertions contained in the Plaintiff's affidavits are cause for pause and concern, as the Plaintiff appears to speak on matters for which she cannot show she has any personal knowledge. Further, the affidavits appear to be wholly comprised of blanket assertions for which the Plaintiff cannot provide factual support.

## B. Plaintiff Fails to Show that she Reported Illegal Activity

Plaintiff's failure to show a genuine issue as to the question of whether Defendants committed illegal acts is, in itself, enough to defeat her claims and grant summary judgment. However, for the sake of thoroughness, the Court briefly addresses the other issues raised by the Defendants.

In her deposition, Plaintiff conceded that she did not know with whom she spoke in the IT department. Although there is no concrete evidence of the call, the Court accepts Plaintiff's version of events. However, even by the Plaintiff's own account of the conversation, she did not say to the unidentified employee that she believed Defendants were taking part in illegal activities. Instead, she simply expressed confusion about how raw data was being processed to produce reports. Taking Plaintiff's own account of the conversation as true, she, at best, shows that the IT employee was unhelpful in clearing up her confusion, and arguably impolite. Further, Plaintiff has no evidence that anyone in IT reported the conversation – good or bad – to anyone else within the company.

Plaintiff also admitted that she did not know whether regional manager Ms. Mills had informed Ms. Andrews of the conversation between Plaintiff and Ms. Mills. Again, however, accepting Plaintiff's version of events, Plaintiff does not appear to have expressed to Ms. Mills that she believed the Defendants to be engaged in any illegal activity. As with the call to the IT department, she instead appears to be expressing confusion as to how the system worked. Even if there were evidence of Ms. Mills reporting the conversation to Ms. Andrews (or anyone else), the Plaintiff has failed to demonstrate that anything she said to Ms. Mills would have been construed as her "reporting illegal activity." Recent case law out of this district supports this Court's conclusion on this issue. In *Bruno v. RIH Requisitions MS I, LLC*, 530 F. Supp. 2d 819

(N.D. Miss. 2008), the court found that an employee's expression of disapproval of employer's actions (in that case, discarding grease into a lake) – whether or not those actions were actually illegal – did not rise to the level of "refusing to participate in an illegal act" as is required in to apply the *McArn* exception. *Id*. at 824.[5]

In her pleadings, Plaintiff attempts to combat this conclusion by stating that, while she did not say any conduct was illegal, it would have been implied or interpreted as such. However, Plaintiff's own blanket assumption about how her words may or may not have been interpreted by another is insufficient for purposes of summary judgment. *Little*, 37 F.3d at 1075.

**C. Plaintiff Fails to Show Termination Based on Complaints**

Lastly, the Court briefly addresses the argument that Plaintiff cannot establish that her termination was based on her supposed complaints to either the IT department or Ms. Mills. On this point the Court agrees with the Defendants. As stated above, by the Plaintiff's own admission, there is no evidence that either of the calls in question were reported to the persons in charge of making employment decisions. What has been presented to the Court, however, is evidence that Defendants had arguably legitimate reasons for terminating employment. According to the sworn declaration of Ms. Andrews, during Plaintiff's employment, Ms. Andrews received several reports of Plaintiff upsetting fellow co-workers and/or patients.[6] In

---

[5] Although the court in *Bruno* did ultimately find that the plaintiff had presented sufficient evidence to create fact issues regarding retaliatory action so as to defeat summary judgment, analogous facts are not present in this case. In *Bruno*, genuine issue of material fact as to whether employee was terminated because of his opposition to his superior's statement that he would not hire job applicant because he was fifty years old precluded summary judgment in employee's *ADEA retaliation* suit. No such additional discriminatory claim has been made here – the Plaintiff rests solely on *McArn* exception claims. On the *McArn* issue, the *Bruno* court found that under Mississippi law, employee's statement to his supervisor that grease from kitchen could not be discarded into river did not constitute opposition to illegal act necessary to support retaliatory discharge claim, where employee did nothing further to either prevent illegal dumping from taking place or to report it to authorities afterwards. Accordingly, the employee could not find relief under *McArn*.

[6] Although any such statements regarding Plaintiff's attitude towards others are out of court statements, they do not qualify as hearsay and are properly considered by the Court. They are not being offered for the truth of the matter asserted (that Plaintiff may or may not have been impolite to co-workers and patients), but are offered to

her opinion, Plaintiff's attitude towards others was straining relationships between Therapy Management and New Albany Rehab. [60, Ex. J]. The evidence presented, even when considered from the Plaintiff's position, does not lead one to conclude that anyone in charge of employment decisions knew of Plaintiff's complaints. Instead, evidence appears to suggest that they had an alternative, appropriate motivation for terminating employment.

## IV. CONCLUSION

The Court seeks every opportunity to view the evidence in the light most favorable to the Plaintiff, but it cannot avoid the clear conclusion that Defendants have met their burden to show an absence of genuine issue of material fact, and that Plaintiff suffers from a lack of evidence on a question on which she carries the burden of proof at trial. Plaintiff predicates this action upon the *McArn* exceptions to employment-at-will standards, but fails, on several counts, to show how the exception applies. Plaintiff fails to present the Court with any substantive evidence. Instead, she relies on her own, unsubstantiated claims, the very basis of knowledge for which the Court has doubts. Case law concerning this issue makes clear that *McArn* exceptions to employment-at-will standards are to be narrowly construed. This Court cannot find any reason, based off the pleadings and evidence with which it has been presented, to deviate from that narrow scope.

For the reasons set forth in detail above, the Court finds that Defendants have met their burden to show that no genuine issue of material fact exists, and summary judgment in their favor is therefore appropriate. Accordingly, it is hereby,

ORDERED that the Motion for Summary Judgment is GRANTED and the case DISMISSED.

---

demonstrate that Defendants had a legitimate, non-retaliatory, reasons for terminating employment. *Anderson v. United States*, 417 U.S. 211, 219, 94 S. Ct. 2253, 2260, 41 L. Ed. 2d 20 (1974) (holding that "out-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted.").

A separate judgment will be entered on this date, pursuant to Federal Rule of Civil Procedure 58.

SO ORDERED this the 7th day of January, 2016.

**/s/ MICHAEL P. MILLS**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF MISSISSIPPI**